## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TARA QUARLES, on behalf of herself and all others similarly situated, <br>             Plaintiff, <br><br><br>      v. <br><br><br> WAKEFERN FOOD CORPORATION <br>          Defendant. | CASE NO. <br><br><br><br> **JURY TRIAL** <br> **DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Tara Quarles brings this action on behalf of herself and all others similarly situated against Defendant Wakefern Food Corporation. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant manufactures distributes, markets, labels and sells vanilla almondmilk beverages under its Wholesome Pantry brand ("Product" or "Vanilla Almondmilk").

2.      During the Class Period (as defined below), Plaintiff purchased the Vanilla Almondmilk at the ShopRite store located at 6301 Oxford Ave Philadelphia, PA 19111.

3.     Defendant deceptively represents the Product's "characterizing" flavor as vanilla.

4.     Plaintiff relied upon this representation when she purchased the Product.

5.     Plaintiff's interpretation of Defendant's representation was reasonable.

6.     Consistent with this reasonable belief, federal agencies have crafted regulations to protect consumers from deceptive vanilla representations.

7.     Because the representations indicate the Product's main or "characterizing" flavor is vanilla, from the multiple use of the word "Vanilla" and multiple pictures of the vanilla flower and vanilla pods, federal and state regulations require that the front label must truthfully disclose to consumers the source of that flavor.[1] 21 C.F.R. § 101.22(i) (requiring statements as to whether flavor is from the characterizing ingredient, natural flavor derived from the ingredient, natural flavor from natural sources other than the ingredient or artificial sources).

8.     Based on (1) the absence of qualifying flavor statements such as "naturally flavored," "other natural flavor" and "artificially flavored" and (2) the presence of the words "Vanilla" and multiple pictures of the vanilla flower and pods,

---

[1] The FDCA and its regulations are incorporated and adopted in the Pennsylvania Food Safety Act and its parallel regulations. *See* 3 Pa. Stat. and Cons. Stat. Ann. § 5733 and § 5736.

consumers get the impression that the Product's flavoring is  sourced only from the natural flavor of vanilla and does not contain artificial flavors.

9.     Plaintiff and Class Members relied on these representations and were injured both in the price paid for the Product as well as the premium paid for the Product over a similar product not bearing this deceptive representation.

10.    Defendant's conduct violated and continues to violate the Unfair Trade Practices and Consumer Protection Law for the Commonwealth of Pennsylvania. Defendant has been and continues to be unjustly enriched. Accordingly, Plaintiff brings this action against Defendant on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

### I.     Consumer Demand for Real Vanilla

11.    For over a century, the citizens of Pennsylvania have sought real vanilla. As the Franklin Fountain describes:[2]

> Up until about 1900, the typical ice cream flavors in Philadelphia were vanilla and lemon. Because of a local penchant for an all-natural product, the seeds of vanilla pods were often mixed into vanilla ice cream.

12.    To Philadelphians, the use of real vanilla derived from vanilla beans and pods is a "mark of quality."[3]

---

[2] *A Treatise on the History of Ice Cream in Philadelphia*, http://www.franklinfountain.com/our-history/a-treatise/ (last visited Mar. 26, 2021).
[3] *Id.*

13.     The demand for real vanilla is not limited to Pennsylvania. Across the country, demand "has been steadily increasing…due to consumer demand for natural foods that are free of artificial ingredients."[4]

14.     According to one flavor supplier, today's consumers "want real vanilla, not imitation flavoring."[5]

15.     Nielsen has reported that 62% of consumers say they try to avoid artificial flavors.[6]

16.     Another study by New Hope Network concludes that "71% of consumers today are avoiding artificial flavors."[7]

17.     Label Insight determined that 76% of consumers avoid products with artificial flavors.[8]

18.     Real flavors "almost always cost much more than an artificial flavor," so companies and consumers are willing to pay higher prices for the real thing – orange flavor from oranges and vanilla flavor from vanilla, as opposed to orange

---

[4] Chagrin Valley Soap & Salve Company, FAQs, Why Are The Prices of Vanilla Bean Products Always Increasing?, https://www.chagrinvalleysoapandsalve.com/why-are-the-prices-of-vanilla-bean-products-always-increasing/ (last visited Mar. 26, 2021).

[5] WHY VANILLA BEANS ARE SO EXPENSIVE?, Sep. 2, 2017, https://www.chagrinvalleysoapandsalve.com/blog/posts/why-vanilla-beans-are-so-expensive/ (last visited Mar. 26, 2021).

[6] Nielsen, *Reaching For Real Ingredients: Avoiding The Artificial*, Sept. 6, 2016, https://www.nielsen.com/us/en/insights/article/2016/reaching-for-real-ingredients-avoiding-the-artificial/ (last visited Mar. 26, 2021).

[7] Alex Smolokoff, *Natural color and flavor trends in food and beverage*, Natural Products Insider, Oct. 11, 2019, https://www.naturalproductsinsider.com/colors-flavors/natural-color-and-flavor-trends-food-and-beverage (last visited Mar. 26, 2021).

[8] Thea Bourianne, *Exploring today's top ingredient trends and how they fit into our health-conscious world*, March 26-28, 2018, https://www.globalfoodforums.com/wp-content/uploads/2018/04/Thea-Bourianne-Exploring-Top-Ingredient-Trends.pdf (last visited Mar. 26, 2021).

flavor synthesized from lemons or vanillin (the main flavor molecule in vanilla) derived from wood pulp or petroleum derivatives.[9]

19.     Flavoring ingredients, especially for products labeled as vanilla, are typically the most expensive ingredient in a food, and vanilla has reached record high prices in recent years.[10]

20.     Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[11]

## II.     Vanilla

21.     Vanilla (*Vanilla planifolia Andrews* and *Vanilla tahitenis Moore*) comes from an orchid plant that originated in Mexico where it was first cultivated.

22.     The vanilla orchid produces a fruit pod, the vanilla bean, which is the raw material for true vanilla flavorings.

23.     The vanilla bean is not consumed by itself – it is heated in the sun for weeks until being soaked in alcohol solution and its flavor constituents extracted (vanilla extract).

---

[9] David Andrews, *Synthetic ingredients in Natural Flavors and Natural Flavors in Artificial flavors*, Environmental Working Group (EWG), https://www.ewg.org/foodscores/content/natural-vs-artificial-flavors/#:~:text=A%20natural%20flavor%20almost%20always,simpler%20than%20%E2%80%9Cnatural%E2%80%9D%20flavors (last visited Mar. 26, 2021).
[10] Finbarr O'Reilly, *Precious as Silver, Vanilla Brings Cash and Crime to Madagascar*, New York Times, Sept. 4, 2018, https://www.nytimes.com/interactive/2018/08/30/world/africa/madagascar-vanilla.html (last visited Mar. 26, 2021).
[11] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018; Kristiana Lalou, *Queen of flavors: Vanilla rises above transparency concerns to lead category*, Food Ingredients First, Sept. 3, 2019 (describing vanilla as "versatile").

24.     The popularity of vanilla in the 19th century led to the isolation of the most predominant flavor component, vanillin.

25.     Sensory evaluation of synthetic vanillin is mainly sweet, with a lackluster "chemicallike"taste and odor because it lacks the other molecules in vanilla.

26.     The availability of low-cost vanillin resulted in foods purporting to contain vanilla despite containing no vanilla or a trace or a *de minimis* amount. Rather, these goods are "boosted" by synthetic vanillin.

27.     Consumers of the good buy foods labeled as "vanilla" only to later discover they lacks the richness and layered taste provided from vanilla beans.

28.     However, vanillin separated from the rest of the vanilla bean does not constitute vanilla flavor.

29.     While vanillin plays a significant role, it constitutes less than one-third of the overall flavor/aroma impact of vanilla.

30.     The characterizing notes of vanillin must be accompanied by other compounds to produce the familiar flavor and aroma consumers are accustomed to as vanilla.

31.     For example, real vanilla is also flavored by:

   i.   **Methyl cinnamate:** Provides cinnamon and creamy notes.

   ii.   **Cinnamyl alcohol**: Provides cinnamon and creamy notes.

   iii.   **P-cresol:** Contributes flavor notes described as woody and spicy.

   iv.   **Acetovanillone**: Provides a sweet, honey taste.

   v.   **P-hydroxybenzoic acid:** Contributes to vanilla's aroma.

   vi.   **Vanillic acid:** Contributes to vanilla's aroma.

   vii.   **P-anisaldehyde:** Provides creamy and floral flavor notes.

   viii.   **P-anisyl alcohol:** Provides creamy and floral flavor notes.

32.     Vanilla's unique flavor cannot be duplicated by science due to over 200 compounds scientists have identified, including volatile constituents such as "acids, ethers, alcohols, acetals, heterocyclics, phenolics, hydrocarbons, esters and carbonyls."[12]

### III.     Vanillin – the "natural flavor"

33.     Vanillin may be natural vanillin or artificial vanillin.

34.     Natural vanillin is only sourced from vanilla beans.

35.     Natural vanillin is not isolated commercially since it is part of vanilla extract.

36.     Vanillin may -  though seldom is – be a "natural flavor" as defined by the FDA:

> [T]he essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional. Natural flavors include the natural essence or extractives obtained from plants listed in §§ 182.10, 182.20, 182.40, and 182.50 and part 184 of this chapter, and the substances listed in § 172.510 of this chapter.

> 21 C.F.R. § 101.22(a)(3).

37.     This means that for vanillin to be labeled as "natural flavor," it must come from a natural source and be made through a natural process, such as distillation, roasting, heating, enzymolysis or fermentation.

---

[12] Arun K. Sinha et al., "A comprehensive review on vanilla flavor: extraction, isolation and quantification of vanillin and other constituents," International Journal of Food Sciences and Nutrition 59.4 (2008): 299-326.

38.     Artificial vanillin sources include guaiacol (coal tar orpetroleum), lignin (tree pulp), and eugenol (clove oil), made through artificial processes. 21 C.F.R.§ 182.60 (listing vanillin as a "Synthetic flavoring substances and adjuvants.").

39.     Vanillin can be derived from Guaicol.

a. Guaiacol is the source of 85% of vanillin.

b. It is obtained from the synthetic petrochemicals, benzene and propylene, whose industrial source is petroleum.

c. Converting Guaiacol to vanillin entails condensation with glyoxylic acid.

d. The processes include chemical reactions such as decarboxylation and aromatic substitution.

e. Vanillin from Guaiacol is an artificial flavor because it is from an artificial source and undergoes artificial processes.

40.     Vanillin can be derived from Lignin.[13]

a. Lignin is present in sulfite wastes of the wood pulp industry.

b. These sulfite wastes contain chemicals used in the processing of wood pulp and are therefore not considered a natural source.

c. Lignin is difficult to degrade by natural means and must be broken down either with sodium hydroxide, nickel or calcium hydroxide and simultaneously oxidized in the air in the presence of these chemical catalysts.

d. When these chemical reactions are completed, the solid wastes and vanillin are removed from the acidified solution with a non-natural solvent, e.g., butanol or benzene, and reextracted with a sodium hydrogen sulfite solution.

e. The vanillin is subjected to reacidification with sulfuric acid followed by vacuum distillation, and several recrystallization cycles before it's finished.

---

[13] Lignin is a class of complex organic polymers that form key structural materials in the support tissues of most plants.

  f. Vanillin from lignin is an artificial flavor because the sulfite wastes of wood pulp are not a natural source, and the chemical reactions used to convert it to vanillin are not natural processes.

  g. Vanillin from lignin is an artificial flavor because its starting material is sulfite waste containing chemicals from the processing of wood pulp and are therefore not a natural source.

  h. Vanillin from lignin is an artificial flavor because it must be subjected to artificial processes in being converted to vanillin.

41. Vanillin can be derived from Eugenol.

  a. Eugenol, the major constituent of clove oil, is a source of vanillin.

  b. The first method of converting eugenol to vanillin requires isomerization of eugenol to isoeugenol under alkaline conditions, followed by side-chain cleavage to vanillin and two-carbon moiety under acidic conditions.

  c. The second method of converting eugenol to vanillin involves the intermediary of coniferyl alcohol which is oxidized to ferulic acid.

  d. The ferulic acid is subjected to high heat of 800 degrees Celsius, high amounts of pressure, 20 atmospheric pressure units, and chemical catalysts, sodium hydroxide or sodium chloride.

  e. Vanillin from Eugenol is an artificial flavor because the high heat, high pressure and chemical catalysts are outside of what is considered a natural process for producing a natural flavor.

42. Whether sourced from Guaicol. Lignin, or Eugenol, flavored derive from any of these sources is not consistent with consumer belief.

43. Because the only natural vanillin is from the vanilla plant, vanillin from non-vanilla sources is artificial.

## IV.     Consumer Deception in the Vanilla Marketplace

44.     The FDA has stated it is misleading to label a food as "Vanilla" accompanied by the term "Naturally Flavored" with pictures of vanilla because this implies the food or beverage is naturally vanilla flavored even though the flavor is not from vanilla beans.

45.     The distinction between vanilla and non-vanilla flavors is discussed in regulatory correspondence and advisory opinions.[14]

46.     For example, in a letter dated February 25, 2016 from Consumer Safety Officer Margarent-Hannah Emerick to Richard Brownell, the FDA stated:

> [T]he term "natural flavor" must not be used in such a way to imply that it is a "natural vanilla flavor", because it is not derived from vanilla beans. Furthermore, if the flavoring ingredient is being used in another food as "vanilla flavoring" and the flavoring was not derived from vanilla, and if the characterizing flavor of the food is vanilla, then the food must be identified as "artificially flavored."

47.     In early 2018, in response to rampant misleading labeling of vanilla products, attorneys for the flavor industry urged their peers to truthfully label vanilla foods so that consumers are not misled. They found that "there are many current examples of food products that are labeled as 'vanilla' that are clearly mislabeled and therefore in violation of FDA regulations."[15]

48.     The authors explain that relevant regulations "require that food products be labeled accurately so that consumers can determine whether the product is flavored with a vanilla flavoring derived from vanilla beans, in whole or in part, or whether the food's vanilla flavor is provided by flavorings not derived from vanilla beans.[16]

---

[14] John B. Hallagan and Joanna Drake, The Flavor Extract Manufacturer's Association (FEMA), "Labeling Vanilla Flavorings and Vanilla Flavored Foods in the U.S.," Perfumer & Flavorist, Vol. 43 at p. 46, Apr. 25, 2018 ("Hallagan & Drake").
[15] *Id.*
[16] *Id.*

49.     The authors noted "Adulteration of vanilla flavorings and foods containing them has long been a problem in the U.S. and there continue to be modern examples."

50.     The harms caused by misleading vanilla labeling include economic deception and use of toxic ingredients:

> While the concern at the time was for the "economic" adulteration of vanilla extract with an artificial and less valuable substance—synthetic vanillin—there was also some concern over the use of other adulterants such as coumarin that were thought to pose a possible safety concern. [17]

51.     To prevent consumer deception in the labeling of significant food products, the government established "food standards allow[ing] consumers to trust that a standardized food is what it purports to be because they establish[ed] explicit specifications for the standardized food."[18]

52.     Requirements for vanilla products were "established by the FDA in the 1960s over growing concern of adulteration of vanilla extract with less valuable substances," which alleviated "potential consumer fraud by establishing specific requirements for vanilla extract and other standardized vanilla products."[19]

53.     The vanilla standards were promulgated to end practices which "deprive the consumer of value the product is represented to have, and for which the consumer pays," such as "the widespread and exceedingly serious adulteration of vanilla extracts that are now labeled 'pure.'"[20]

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960.

54.     At the time, the FDA stated that "the purposes of the standards are to assure that the consumer gets what is expected when purchasing vanilla products."[21]

55.     The FDA section chief in charge noted: "The prime purpose sought to be served by the standards adopted was to promote honest, fair dealing with housewives and other consumers of the flavorings covered by the standards."[22]

56.     Industry leaders supported vanilla standards to "insure, for the protection of both the consumers and our industry, that all vanilla products are correctly labeled and meet at least minimum standards."[23]

57.     The vanilla standards are:

> [A] series of individual standards that describe the common or usual name and recipes for eight flavorings: vanilla extract, concentrated vanilla extract, vanilla flavoring, concentrated vanilla flavoring, vanilla powder, vanilla-vanillin extract, vanilla-vanillin flavoring, and vanilla-vanillin powder.
>
> These eight individual standards, at 21 CFR 169.175 – 169.182, are supported by specific requirements for the vanilla beans that may be used to produce vanilla extract and other vanilla products.[24]

58.     Three of these standards "combine vanilla extract with the primary chemically defined flavoring substance in vanilla beans, vanillin."[25]

59.     Because Hallagan and Drake felt they needed to publicly identify the misleading labeling of vanilla products to their peers in the flavor and food industry indicates that many are unaware, misunderstand or ignore vanilla labeling requirements.

---

[21] Press Release U.S. Department of Health, Education, and Welfare, September 13, 1963.
[22] Memorandum of Telephone Conversation between Mr. Alfred Daibock, Commercial Policy Division, Department of State and Tom Bellis, Food Standards Branch, FDA.
[23] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960.
[24] *Id.*
[25] *Id.*

60.    To correctly label foods with a characterizing flavor of vanilla,

Hallagan and Drake stress two key points:

  a.    "The federal standards of identity for vanilla flavorings at 21
        CFR Section 169 [and ice cream at 21 CFR Section 135,] and
        their labeling requirements, take precedence over the general
        flavor and food labeling regulations at 21 CFR Section 101.22;"

  b.    "The federal standard of identity for vanilla flavorings at 21
        CFR Section 169 applies to both the flavorings sold directly to
        consumers and to food manufacturers [for use in finished food
        products]."[26]

61.    This confusion in labeling vanilla products is exacerbated because the

regulations are not complete on their own, but require incorporating external

documents of limited availability. Hallagan and Drake ("A variety of resources are

available to flavor and food manufacturers and consumers that facilitate an

understanding of the proper labeling of vanilla flavorings and vanilla-flavored

foods.").

62.    These resources include:

    [A] formal advisory opinion issued by FDA and a variety of
    regulatory correspondence issued by FDA in response to inquiries
    from other federal agencies, industry, and the public.

63.    The regulatory correspondence clarifies the relationship between the

general flavor regulations and vanilla regulations:

    It is important to emphasize that these [at 21 CFR Sections
    101.22(i)(1), (2) and (3)] regulations apply only to foods that are
    not subject to a federal standard of identity.

    …

    These regulations, found at 21 CFR Section 101.22, apply to all
    foods except for those subject to a federal standard of identity and
    this has often resulted in some confusion with the standards
    governing vanilla flavorings and ice cream that have their own

---

[26] Hallagan and Drake, FEMA, "Labeling Vanilla Flavorings and Vanilla-Flavored
Foods in the U.S.," at  34.

requirements for proper labeling as required in FFDCA Section 403.[27]

64.    A significant distinction noted by Hallagan and Drake is that:

The U.S. federal standard of identity for vanilla flavorings does not provide for the designation of any vanilla flavorings as "vanilla with other natural flavors" or "vanilla WONF."[28]

65.    The purpose of not providing for the designation of "Vanilla WONF" was to prevent consumers from being misled by a small amount of vanilla, boosted by artificial vanilla flavors, including vanillin.

66.    According to Hallagan and Drake, "Severe price and supply dislocations have historically coincided with changes in practices related to the composition and labeling of vanilla flavorings."[29]

67.    Where vanilla prices are high, "synthetic vanillin-based flavorings may be used to replace vanilla extract, or to adulterate vanilla extract in violation of the federal standard of identity."

68.    Moreover, "Recent increased emphasis on consumers' desires for foods containing 'natural' food ingredients has resulted in the exploration of vanilla flavoring alternatives that are not derived from vanilla beans."

69.    These two trends – high vanilla prices and an industry focus on providing "natural flavors" – have coincided with a third development – the manufacture of vanillin through a purportedly natural process, such as fermentation.

---

[27] *Id.*
[28] *Id.*
[29] *Id.*

70.     Many flavor suppliers have mistakenly touted their vanillin products as "natural vanillin" and promoted such flavors as replacements for vanilla extract.[30]

71.     Producers of vanillin made through natural processes promote it as a substitute for "real vanilla extract drop-for-drop."

72.     This "natural vanillin" is then added to real vanilla, and companies erroneously and/or intentionally identify it as a "natural flavor" to consumers.

73.     The Commonwealth of Pennsylvania has adopted all federal regulations for food labeling through the Pennsylvania Food Safety Act, which means the requirements explained by Hallagan and Drake apply to labeling of vanilla products in Pennsylvania.

## JURISDICTION AND VENUE

74.     This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the Pennsylvania consumer market and distributes the Products to many locations within this County and retail locations throughout the Commonwealth of Pennsylvania, where the Products are purchased by consumers every day.

---

[30] *See* Kristine Sherred, *Natural vanillin: Is it the stable flavor source the industry needs? Confectionary News*, June 14, 2019, https://www.confectionerynews.com/Article/2019/06/14/Natural-vanillin-Is-it-the-stable-flavor-source-the-industry-needs (erroneously stating that the "FDA has certified only Rhovanil as 'natural vanillin' since changing its rules in 2007.") *compare with* Hallagan and Drake, p. 48 ("FDA has clearly stated that the only vanillin that the agency will regard as 'natural vanillin' is vanillin derived from vanilla beans, which is rarely if ever produced for economic reasons.").

75.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

76.     Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff's purchase of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of deceptive and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

## PARTIES

77.     Plaintiff is a citizen of Pennsylvania, residing in Philadelphia County. In January 2020, she purchased Defendant's Product from the ShopRite store located at 6301 Oxford Ave Philadelphia, PA 19111. Prior to purchasing the Product, Plaintiff saw and read the packaging and relied on the representation that the product would be made from real vanilla and taste like real vanilla. Plaintiff relied upon "Vanilla" placed in bright, blue letters and images of vanilla flowers and pods placed throughout the Product. Plaintiff purchased the Product at a price

premium, and would not have purchased the products had she known that the representations she relied on was misleading, deceptive and unfair. Plaintiff consumed the product. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's labels are consistent with the Product's components.

78.     Defendant Wakefern Food Corporation is a New Jersey corporation with its principal place of business in Keasbey, New Jersey.

    a.  Defendant produces, markets and distributes the Products in retail stores across the United States including stores physically located in the Commonwealth of Pennsylvania and this district.

79.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the deceptive conduct alleged herein.

80.     Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## FACTS COMMON TO ALL CAUSES OF ACTION

81.     Defendant's Product is sold in two sizes (32 oz. and 64 oz.) with multiple vanilla representations on each label.

82.     The 32 oz. size sells for $1.79, and the 64 oz. size sells for $1.99.

83.     The front label of both sizes of the Product states "Vanilla" in a bold, blue font. Further, Defendant prominently places a pair of vanilla bean pods and a vanilla flower on the front label.



84.     The top label of both sizes of the Product states "Vanilla" in a bold, blue font. Further, Defendant prominently places a pair of vanilla bean pods and a vanilla flower on both sections of  the top label of its 64 oz. version of Product:



85.    From almost every angle, Defendant wants consumers to see the vanilla representations.

86.    For example, this ¾ angle view shows how prominent the vanilla representations are made on each size of the Product:





87.    The emphasis on the natural vanilla flavor is shown by the presence of the vanilla flower and pods resting on top of the almonds. This depiction is placed in multiple locations on the Product. Defendant places great importance on the source of the vanilla flavor:



88.    Additionally, the Product pledges that it is "free from artificial colors, flavors, and preservatives."

89.    Despite these representations, Defendant's Product contains added artificial flavors which include artificial vanillin.

90.     The ingredients are listed:

ALMONDMILK (FILTERED WATER, ALMONDS), CANE SUGAR SYRUP, NATURAL FLAVOR, SEA SALT, GELLAN GUM, XANTHAN GUM, SUNFLOWER LECITHIN, CALCIUM CARBONATE, VITAMIN E ACETATE, ZINC GLUCONATE, VITAMINA A PALMITATE, VITAMIN B12, VITAMIN D3.

91.     The Product's ingredient list tacitly reveals it is not flavored exclusively with vanilla because it lists the generic ingredient "natural flavor" instead of vanilla extract.

92.     However, the ingredient list conceals the added artificial flavor – vanillin – as part of the generic "natural flavor" instead of using the specific, non-generic name of the ingredient – "vanillin" or "artificial flavor." 21 C.F.R. § 101.4(b)(1).

93.     Even if reasonable consumers were to investigate the "Vanilla" statements on the Product's front label by scrutinizing the ingredient statement on the back, consumers would still be unaware that the Product contained artificial flavor.

94.     In addition to containing artificial flavor, the Product lacks the expected vanilla taste because vanillin is not synonymous with vanilla, due to the absence of the critical odor-active compounds which contribute to the flavor of vanilla.

95.     According to labeling experts – but not reasonable consumers – "Brands that print phrases like 'natural vanilla' [or 'natural flavor'] on their packages may actually be pushing products that contain anything but."[31]

96.     Professor of Food Science, Scott Rankin, at the University of Wisconsin-Madison, explained that "the different wordings on the labels amount to an industry shorthand for specific kinds of natural or artificial flavorings."

97.     For instance, "natural vanilla flavor" often refers to "vanillin extracted from wood."

98.     "Natural flavor" on the other hand, "(with no mention of vanilla at all) indicates just a trace of natural vanilla (there's no required level)" and other flavorings that simulate vanilla.

99.     Defendant's "Natural Flavor" contains added artificial vanillin yet fails to disclose it separately.

100.    Although the flavoring used to simulate the Product's characterizing vanilla flavor is (1) not from vanilla beans, (2) from an artificial petrochemical source and (3) made through an artificial process, Defendant pretends otherwise, conflating the natural and artificial flavoring and deceiving consumers.

101.    Even if the added artificial vanillin used in the Product was made from a natural source and through a natural process, the Product would still be required to state "artificially flavored" on the front label.

---

[31] Yahoo Food, *The One Thing You Need to Know When Buying Vanilla Ice Cream*, May 20, 2015 (though the discussion was centered on ice cream, the identification of ingredients is identical on ice cream or almond milk).

102.    Since the only natural vanillin is from the vanilla plant, the Product's added vanillin from other, non-vanilla sources is by definition, artificial, and an artificial flavor.

103.    Federal and state law require the Product's front label to inform consumers that the Product contains artificial flavoring. 21 C.F.R. § 101.22(c).

104.    Because the Product contains artificial flavor that "simulates, resembles or reinforces the characterizing flavor," the front label is required to state, "Artificially Flavored." 21 C.F.R. § 101.22(i)(2).

105.    The label and ingredient list fail to reveal the presence of artificial flavor even though they are required by law to disclose this fact.

106.    Defendant misrepresented the Product through affirmative statements and omissions.

107.    Defendant sold more of the Product and at higher prices than it would have in absence of this misconduct, resulting in additional profits at the expense of consumers.

108.    Plaintiff and Class Members purchased the Product because they reasonably believed it was flavored only with natural vanilla and did not contain artificial flavors.

109.    Had Plaintiff and the Class Members known the truth, they would not have bought the Product or would have paid less for it.

110.    Plaintiff and Class Members would not have been able to discover Defendant's deceptive practices and lacked the means to discover them given that,

like nearly all consumers, they rely on and are entitled to rely on the manufacturer's obligation to label its products in compliance with federal regulations and state law.

111.    Plaintiff and Class members lack the meaningful ability to test or independently ascertain or verify the representations made on product packaging, especially at the point of sale.

112.    Plaintiff and Class Members would not know the true nature of the ingredients merely by reading the ingredients label.

113.    Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of a product in order to confirm or debunk prominent claims and representations made thereon.

114.    Furthermore, Defendant's labeling practices and nondisclosures, in particular, failing to identify the artificial flavor on the front label and the ingredient list impeded Plaintiff and the Class Members' abilities to discover the deceptive and unlawful labeling of the Product throughout the Class Period.

## CLASS DEFINITIONS AND ALLEGATIONS

115.    Plaintiff, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), brings this action on behalf of the following class:

    a.  Pennsylvania Class: All persons who purchased Defendant's Product within the Commonwealth of Pennsylvania and within the applicable statute of limitations period.

116.    Excluded from the Class is Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Product for resale, all persons who make a timely election to be excluded from the Class, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

117.    The members of the Class are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, tens of thousands of units of the Product to Class Members.

118.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative class that predominate over questions that may affect individual Class Members include, but are not limited to the following:

a.  whether Defendant misrepresented material facts concerning the Product on the label;

b.  whether Defendant's conduct was unfair and/or deceptive;

c.  whether Defendant has been unjustly enriched as a result of the unlawful, deceptive, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon them by Plaintiff and the Class;

d.  whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

    e.   whether Plaintiff and the class have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

119.   Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the class, purchased Defendant's Products bearing the vanilla representations and Plaintiff sustained damages from Defendant's wrongful conduct.

120.   Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the Class.

121.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the

benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

122.   The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate equitable relief with respect to the Class as a whole.

123.   The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class Members are not parties to such actions.

## COUNT I
### Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law,
### 73 Pa. Cons. Stat. §§ 201-2, *et seq.*

124.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

125.   Plaintiff brings this Count individually and on behalf of the members of the Class.

126.   As alleged more fully above, Defendant has violated the Unfair Trade Practices and Consumer Protection Law by deceptively and misleadingly representing to Plaintiff and the other members of the Class that the Product's

27

flavor and taste are sourced exclusively from real vanilla when in fact they are made with artificial vanillin.

127.   Defendant is a "person," as meant by 73 Pa. Cons. Stat. § 201-2(2).

128.   Plaintiff and Class Members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

129.   Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. § 201-3, including the following:

   a.   representing that its goods and services have characteristics, uses, benefits, and qualities they do not have (73 Pa. Cons. Stat. § 201-2(4)(v));

   b.   representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Cons. Stat. § 201-2(v)(vii));

   c.   advertising its goods and services with intent not to sell them as advertised (73 Pa. Cons. Stat. § 201-2(4)(ix)); and

   d.   engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (73 Pa. Cons. Stat. § 201-2(v)(xxi)).

130.   Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

131.    Plaintiff and the Class members reasonably relied to their detriment on Defendant's misleading representations and omissions.

132.    Defendant's misleading and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled the Plaintiff and the Class Members.

133.    In making the misleading, deceptive representations and omissions described herein, Defendant knew and intended that consumers would purchase the Product and pay a premium for the Product.

134.    Had Defendant not made the misleading and deceptive representations, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Product.

135.    As an immediate, direct, and proximate result of Defendant's misleading and deceptive representations, Defendant injured the Plaintiff and the Class Members in that they:

    a.  Paid a sum of money for Product that were not what Defendant represented;

    b.  Paid a premium price for Product that were not what Defendant represented;

    c.  Were deprived of the benefit of the bargain because the Product they purchased were different from what Defendant warranted; and

d. Were deprived of the benefit of the bargain because the Product they

purchased had less value than what Defendant represented.

136. Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief this Court deems necessary or proper.

## COUNT II
## Unjust Enrichment

137. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

138. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against the Defendant.

139. At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the Class.

140. Plaintiff and members of the Class conferred upon Defendant nongratuitous payments for the Product that they would not have if not for Defendant's deceptive advertising and marketing. Defendant accepted or retained the nongratuitous benefits conferred by Plaintiff and members of the Class, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and members of the Class were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

141.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Product. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Product if the true facts had been known.

142.   Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Class for their unjust enrichment, as ordered by the Court.

## **RELIEF DEMANDED**

143.   WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the members of the Class;

b.   For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c.  For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Class for all causes of action;

d.  For an order requiring Defendant to immediately cease and desist from selling its misbranded Product in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e.  For prejudgment and postjudgment interest on all amounts awarded;

f.  For an order awarding punitive damages; and

g.  For an order awarding attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: March 29, 2021

Respectfully submitted,

/s/ Steffan T. Keeton
Steffan T. Keeton, Esq.
Pa. Id. No. 314635
stkeeton@keetonfirm.com

**The Keeton Firm LLC**
100 S Commons, Ste. 102
Pittsburgh, PA 15212
Phone: 1-888-412-5291

*Attorney for Plaintiff and the Class*